UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 18-civ-23105-Cooke/Goodman

BISCAYNE BEACH CLUB
CONDOMINIUM ASSOCIATION, INC.,

        Plaintiff,

v.

WESTCHESTER SURPLUS LINES
INSURANCE COMPANY,

        Defendant.

_____/

## DEFENDANT'S RENEWED MOTION TO VACATE APPRAISAL AWARDS

Defendant, Westchester Surplus Lines Insurance Company ("Westchester"), files this Renewed Motion to Vacate Appraisal Awards, and states as follows:

### INTRODUCTION

Biscayne Beach Club Condominium Association, Inc. ("Biscayne Beach") filed two property insurance claims with Westchester several weeks apart, one for Hurricane Irma and one for Tropical Storm Philippe. To resolve a dispute as to the amount of loss, Biscayne Beach filed this lawsuit and then invoked the policy's appraisal provision, which required each party to select a "competent and impartial appraiser." Biscayne Beach initially appointed as its appraiser Lester Martinez, its public adjuster. Westchester objected because Mr. Martinez has a contingent fee agreement, and, thus, cannot be impartial. Biscayne Beach then named as its appraiser Blake Pyka.

Mr. Pyka produced a final estimate of more than $40,000,000, nearly triple the policy limit. In making his estimates, Mr. Pyka appears to have recycled the estimates written by Mr. Martinez; both Mr. Martinez and Mr. Pyka produced estimates dated May 22, 2018, even though Mr. Pyka was not hired until October 2018. Then, approximately seventeen months into the appraisal, Mr. Pyka disclosed to the panel that he was entitled to a percentage

of the appraisal award. Mr. Pyka admits that he believed he had a contingent fee, and in fact drafted and delivered several written contingent fee agreements.

Biscayne Beach has advised that it has no written evidence that it had an hourly fee arrangement with Mr. Pyka. The only document produced in discovery that can potentially support Biscayne Beach's contention that it had an hourly fee arrangement with Mr. Pyka is a Microsoft Excel spreadsheet that Mr. Pyka described as being his contemporaneously-kept time log. It is apparent, however, that this spreadsheet was recently fabricated. Many of the entries for events taking place in 2018 and 2019 were mistakenly entered with 2021 dates and some significant events are either misdated or are missing. Biscayne Beach and Mr. Pyka have perpetrated a fraud on this Court by fabricating evidence.

The appraisal awards should be vacated because it is undisputed that throughout the appraisal, Mr. Pyka believed he had a financial interest in the outcome and offered multiple times to work on a contingent fee basis. It also appears that Mr. Pyka was influenced by Biscayne Beach's public adjuster, as he used Xactimate estimates that pre-date his involvement in the claims. Further, the appraisal award is too vague for the Court to determine what amounts are covered under the policy. The appraisal panel as a whole was not able to explain what they awarded or why. Last, the fabricated time log produced by Mr. Pyka, together with the other evidence obtained in discovery, shows a scheme to conceal Mr. Pyka's fee agreement so that the clearly-partial Mr. Pyka could serve as appraiser and influence the appraisal.

## FACTUAL BACKGROUND

1.      Westchester issued a commercial property insurance policy to Biscayne Beach bearing policy number D38045994 001, with policy period from August 27, 2017 to August 27, 2018 ("Policy"), a copy of which is attached as Exhibit 1.

2.      Biscayne Beach filed two insurance claims under the Policy in 2017 for property damage to its insured condominium buildings, one claim relating to Hurricane Irma, and one claim relating to Tropical Storm Philippe, which occurred several weeks later.

3.      After Westchester made a series of advance payments to Biscayne Beach, Biscayne Beach filed this lawsuit [D.E. 1-4] and then promptly demanded appraisal. Biscayne Beach named as its appraiser Lester Martinez, Biscayne Beach's public adjuster.[1]

4.      The Policy's appraisal provision states:

**2. Appraisal**
If we and you disagree on the value of the property or the amount of loss, either may make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser. The two appraisers will select an umpire…. A decision agreed to by any two will be binding…. If there is an appraisal, we will still retain our right to deny the claim.

5.      Westchester responded to Biscayne Beach [D.E. 11-3], and advised that Mr. Martinez cannot serve as appraiser because he is not "impartial" due to his 10% contingent fee. [D.E. 11-3]. Westchester also reserved its rights with respect to several potential coverage issues. Westchester named as its appraiser Pat Lewis of Independent Consulting Services.[2]

6.      On September 13, 2018, the parties filed a Stipulation Abating Lawsuit Pending Appraisal [D.E. 11], and acknowledged: "Defendant's response outlined certain coverage issues that limit the appraisal and serves as the basis upon which the parties agreed to enter into this stipulation…. Defendant further objected to Plaintiff's choice of Mr. Martinez [as] appraiser in the belief that he is not 'impartial.'"

7.      Biscayne Beach named as its appraiser Blake Pyka of National Adjusting Solutions, LLC in October of 2018.[3]

### The Appraisal

8.      Keith Womack was appointed umpire by Mr. Pyka[4] and Mr. Lewis.[5]

9.      Initially, counsel for Biscayne Beach and Biscayne Beach's general contractor accompanied Mr. Pyka on his inspections of the property and sought to actively participate in the appraisal. However, Mr. Lewis advised that they should not be actively involved in appraisal discussions because they are not disinterested.[6]

---

[1] Exhibit 2, Lester Martinez Adjuster's Retainer Agreement.
[2] Exhibit 3, Deposition of Patrick Lewis 9:5-9:8.
[3] Exhibit 4, Deposition of Domenic Macarina as Rule 30(b)(6) Witness for Biscayne Beach 8:14-8:17; Exhibit 5, Deposition of Blake Pyka 12:22-12:24.
[4] Ex. 5, Pyka Dep. 15:23-16:1.
[5] Exhibit 6, Deposition of Keith Womack 11:10-12:9.
[6] Ex. 3, Lewis Dep. 10:6-13:7.

10.     During appraisal, Mr. Pyka estimated Biscayne Beach's loss to be more than $40 million.[7] In contrast, Mr. Pyka submitted invoices for incurred expenses totaling only approximately $1.2 million.[8]

11.     Mr. Pyka submitted estimates with a "Date Entered" of 5/22/2018, which was approximately five months before he was appointed as appraiser. Exhibit 7, Wolfinger Forensics Expert Report, at 3, 14-16. The estimates prepared by Mr. Martinez also have a "Date Entered" of 5/22/2018, which suggests that Mr. Pyka relied on the estimate data files from Mr. Martinez.

12.     In March 2020, the appraisal panel entered a series of awards (one for each building, for each claim) reflecting a total award of $13,844,843.83.[9] Copies of the appraisal awards are attached as Exhibit 8 (collectively, the "Appraisal Awards").

13.     Although the Appraisal Awards purport to set the amount of loss for the damage to twelve buildings, sustained over two losses, at more than $13.8 million, only one page of the award provides any level of detail about contemplated repairs.[10] This single page is too vague for any reader to determine what property damage is at issue and what repairs were determined to be necessary, and therefore, does not provide sufficient information to determine which of the amounts awarded are covered under the Policy.

14.      Not only are the Appraisal Awards ambiguous, the panel cannot sufficiently elaborate on what they awarded or why. The umpire, Mr. Womack, primarily sought consensus[11] rather than an award that reflected costs for specific repairs for specific damage.

15.     Mr. Pyka, having been prepared for deposition by counsel for Biscayne Beach,[12] consistently testified that everything awarded was for direct physical loss, but could not remember any specifics.[13]

---

[7] Ex. 6, Womack Dep. 19:11-19:15; Ex. 5, Pyka Dep. 21:8-21:19, 46:20-47:2, Exhibit A.
[8] *See* Summary of Incurred Invoice [ECF No. 36-5].
[9] Womack Dep. 17:21-18:7, 20:11-20:16, Exhibit A; Pyka Dep. Ex. A.
[10] Ex. 8, Appraisal Awards, at 27. Exhibit A, Appraisal Awards, at 27.
[11] Ex. 6, Womack Dep. 25:15-26:1, 26:9-26:18, 46:20-47:14, 49:12-49:18, 52:7-52:24.
[12] Ex. 5, Pyka Dep. 8:13-9:17.
[13] Pyka Dep. 33:11-34:13; 39:1-39:7, 41:25-42:3.

16.     Mr. Womack admits that some stucco repairs were for matching,[14] but cannot quantify the amount.[15] All Mr. Pyka knows is that the panel agreed to an amount for stucco.[16] Mr. Lewis contends that the difference between the award amount for stucco of $1,826,676.43 and his estimate of $26,682.56 was for matching purposes.[17]

17.     Mr. Womack is uncertain as to why painting costs were awarded.[18] Neither Mr. Womack nor Mr. Pyka is sure if the Appraisal Awards include repainting the exterior of each building.[19]

18.     Mr. Womack recalled Mr. Pyka advising the panel that replacement of all roof sheathing was a building code requirement,[20] but he is not sure if the Appraisal Awards contain any amounts for roof sheathing;[21] however, if it does, those costs might be because of the applicable building code.[22] Mr. Pyka accepts that the email records reflect that he would provide documentation relating to building code requirements for roof sheathing because Mr. Lewis asked for it, and states it "could have been" because Mr. Pyka advised that the sheathing had to be replaced due to code requirements.[23] Mr. Lewis testified that Mr. Pyka advised the panel that the sheathing must be brought up to code.[24]

19.     Mr. Womack and Mr. Pyka were both unable to explain the costs in the Appraisal Awards for ornamental iron work,[25] plumbing,[26] or water remediation.[27] Mr. Lewis was also unable to explain the ornamental iron work costs.[28]

---

[14] Womack Dep. 27:13-27:24.
[15] Womack Dep. 28:19-29:2.
[16] Ex. 5, Pyka Dep. 28:25-29:8.
[17] Ex. 3, Lewis Dep. 25:7-27:13, 111:15-113:22.
[18] Ex. 6, Womack Dep. 25:12-25:18.
[19] Womack Dep. 25:19-26:18; Pyka Dep. 25:7-28:18.
[20] Womack Dep. 32:10-32:23.
[21] Womack Dep. 32:24-34:6; 58:2-58:7.
[22] Womack Dep. 58:8-58:19.
[23] Ex. 5, Pyka Dep. 29:11-31:25.
[24] Ex. 3, Lewis Dep. 30:3-30:21.
[25] Ex. 6, Womack Dep. 46:4-46:10; Pyka Dep. 40:10-40:12.
[26] Womack Dep. 49:10-49:11; Pyka Dep. 43:12-43:15.
[27] Womack Dep. 49:12-49:49:19; Pyka Dep. 43:17-43:21.
[28] Ex. 3, Lewis Dep. 38:7-38:15.

20.     Neither Mr. Womack nor Mr. Pyka could explain the framing costs, but Mr. Womack thinks it is either sheathing or truss repairs,[29] whereas Mr. Pyka thinks framing refers to door framing, window framing, or truss systems, but not sheathing.[30] Mr. Lewis testified that framing refers to the sheathing replacement.[31]

21.     Mr. Womack could not explain the costs for insulation[32] or cleaning.[33] Mr. Lewis is similarly uncertain about the cleaning award.[34]

### Mr. Pyka's Financial Interest in the Appraisal

22.     Neither Biscayne Beach nor Mr. Pyka are in possession of a single email reflecting an hourly fee agreement.[35] No written hourly fee agreement between Biscayne Beach and Mr. Pyka exists.[36]

23.     On August 5, 2019, ten months into the appraisal, Mr. Pyka sent to Lester Martinez, contracted public adjuster for Biscayne Beach, a fee agreement reflecting a 1% contingent fee.[37] Mr. Martinez advised Mr. Pyka to identify Biscayne Beach as the client, and then on August 19, 2019, Mr. Pyka sent another contingent fee agreement to Mr. Martinez for signature.[38] Mr. Martinez, Biscayne Beach's public adjuster and agent, forwarded this contingent fee agreement to Mr. Jomarron, counsel for Biscayne Beach, with instructions to "get this signed for Blake."[39]

24.     Mr. Pyka admits that during the appraisal, he offered several times to work on a contingent fee basis.[40]

---

[29] Womack Dep. 33:22-35:4.
[30] Ex. 5, Pyka Dep. 34:21-35:11.
[31] Ex. 3, Lewis Dep. 32:4-32:18.
[32] Ex. 6, Womack Dep. 34:7-34:20.
[33] Womack Dep. 46:11-47:17.
[34] Ex. 3, Lewis Dep. 38:16-39:1.
[35] *See* Pyka Dep. 13:3-13:21, 91:8-92:1,3 Ex. P; Ex. 4, Macrina Dep. Exhibit D (Request Nos. 1, 2), Exhibit E, Exhibit I.
[36] Ex. 4, Macrina Dep. 13:3-13:5.
[37] Pyka Dep. 67:14-68:22, Exhibit K.
[38] Ex. 5, Pyka Dep. 72:22-73:23, Exhibit L.
[39] Pyka Dep. Exhibit L.
[40] Pyka Dep. 68:23-70:7; 73:11-74:9; 85:10-85:18.

25.     On February 3, 2020, Mr. Pyka emailed Mr. Lewis and Mr. Womack, stating: "Before we start with the final negotiations, please note that I have a very small percentage representing this file and does not and will not have any influence of any kind."[41]

26.     Mr. Pyka admits that on February 3, 2020, he "**believed** that [he] was being compensated on a contingent fee basis."[42] Mr. Pyka contends that his "mistaken belief that [he] had a contingent fee agreement did not manifest until [his] review of the file on February 3, 2020."[43] Yet, Mr. Pyka produced multiple emails reflecting a contingent fee agreement.

27.     Mr. Pyka repeatedly testified that he drafted the two contingency fee agreements and sent his February 3, 2020 email because he was confused about his fee agreement as a result of being "so busy."[44] While Mr. Pyka contends that the Biscayne Beach appraisal was merely one of hundreds that he was working on, it was the only appraisal Mr. Pyka had in which he was appointed on behalf of a policyholder.[45] Further, on all of Mr. Pyka's other claims, his insurance company clients pay him approximately $150/hour.[46] Biscayne Beach, however, agreed to pay Mr. Pyka $325/hour.[47] Yet, Mr. Pyka testified that he was unable to remember why his only policyholder client was paying him more than double what he typically makes, or whether he was entitled to a percentage of the appraisal award he was estimating at more than $40 million.[48]

28.     Mr. Pyka contends that his "mistaken belief had zero impact … because the appraisal amounts had been determined and agreed upon by the panel prior to February 3, 2020, and did not change through entry of the award …." He contends that "[a]fter February 3, 2020, [he] merely worked with the panel on the formatting of the award documents."[49]

29.     Despite his sworn statement that all that was left to do was "the formatting of the award," Mr. Pyka admits that the award amounts were not negotiated and written down

---

[41] Pyka Dep. Exhibit M, 74:15-75:14.
[42] Affidavit of Blake Pyka ¶ 8 [ECF No. 34-4] (emphasis added); Pyka Dep. Exhibit N.
[43] Affidavit of Blake Pyka ¶ 12 [ECF No. 34-4]; Pyka Dep. Ex. N.
[44] Ex. 5, Pyka Dep. 68:23-70:22; 73:24-74:9; 75:19-76:24; 77:12-77:21; 78:3-78:22; 86:23-87:7.
[45] Pyka Dep. 71:8-71:16; 74:10-74:12.
[46] Pyka Dep. 65:14-66:1.
[47] Pyka Dep. 62:3-62:9; 65:5-65:13; Ex. 4, Macrina Dep. 22:17-22:25.
[48] A typical 2000 billable hour year would yield approximately $300,000 in top line revenue for Mr. Pyka. One percent of a $40 million award would equal approximately sixteen months of hourly revenue.
[49] Affidavit of Blake Pyka ¶¶ 13-14 [ECF No. 34-4].

7

until the panel had a conference call that took place after he sent his disclosure email.[50] Mr. Pyka admits that he did not agree to the building valuations until several weeks later.[51]

30.     Mr. Pyka contends that he did not "realize" he had an hourly fee agreement until well after the Appraisal Awards were entered, when Mr. Jomarron contacted him to sign the affidavit.[52]

31.     Mr. Pyka has still not submitted a single invoice to Biscayne Beach.[53] Mr. Pyka has not asked Biscayne Beach for money and does not intend to do so until after this lawsuit is resolved.[54] Biscayne Beach has not paid Mr. Pyka.[55]

32.     With respect to the agreed to building valuations, Mr. Pyka acknowledges that his $40+ million estimate is triple what it should cost to replace every single building in the event of a complete total loss.[56] Of course, none of the buildings were a total loss.[57]

### Discovery Limitations and Procedural Background

33.     Westchester served written discovery requests on Biscayne Beach, took a Rule 30(b)(6) deposition, and took the depositions of Mr. Pyka, Mr. Lewis and Mr. Womack. During Mr. Pyka's deposition, Mr. Jomarron advised that he screens Mr. Pyka's documents before Mr. Pyka sends them to Westchester.[58]

34.     The evidence about Mr. Pyka's fee agreement is at best inconsistent and leaves many questions unanswered regarding his impartiality. However, Biscayne Beach is in complete control of all the information, and Westchester can only offer the Court the evidence that Biscayne Beach allowed Westchester to see.

### Scheme to Conceal Mr. Pyka's Fee Agreement

35.     In its opposition to Westchester's request to conduct discovery, Biscayne Beach submitted the Affidavit of Blake Pyka. Mr. Pyka and Mr. Jomarron wrote the affidavit

---

[50] Ex. 5, Pyka Dep. 47:21-49:25, Exhibit E.
[51] Pyka Dep. 49:9-49:25, Exhibit F.
[52] Pyka Dep. 86:2-86:16.
[53] Pyka Dep. 55:2-55:14; 66:11-66:14.
[54] Pyka Dep. 66:22-66:10.
[55] Ex. 4, Macrina Dep. 23:5-23:8.
[56] Pyka Dep. 44:9-47:2.
[57] Ex. 4, Macrina Dep. 18:7-18:15.
[58] *See* Ex. 5, Pyka Dep. 58:15-58:25.

together while at Mr. Jomarron's office.[59] There are no e-mails attaching or discussing the affidavit.[60]

36.     After Westchester served a request for production relating to Mr. Pyka's compensation and affidavit, Biscayne Beach produced only two documents:[61] the August 19, 2019 email to Mr. Jomarron attaching Mr. Pyka's contingent fee agreement, and a copy of the affidavit itself. Biscayne Beach produced no other emails or documents. Even though Florida law requires condominium boards to keep minutes of board meetings and votes,[62] Biscayne Beach contends it has no minutes of the meeting where the board purportedly voted to pay Mr. Pyka $325/hour.[63] It is not clear how the board voted on this given that Mr. Jomarron is the only agent of Biscayne Beach with knowledge of Mr. Pyka's fee agreement.[64]

37.     In depositions, Biscayne Beach and Mr. Pyka attempted to provide an explanation for Mr. Pyka's disclosure about his contingent fee agreement. Mr. Pyka refused to admit to the same statements he swore to in his affidavit.[65] During his testimony, Mr. Pyka, for the first time advised that he had a contemporaneous time log document, even though he did not produce that document in response to Westchester's document subpoena.[66]

38.     After disclosing his purportedly contemporaneously-kept time log, Mr. Pyka emailed a native copy of the time log, an Excel spreadsheet, to counsel for Westchester.[67] A printout of the log was made Exhibit J to the deposition. Mr. Pyka admitted to editing the document the day prior, so little valuable information could be gleaned from the document metadata.[68] The Excel spreadsheet time log produced by Mr. Pyka log reflected numerous entries throughout the course of the appraisal and up to Mr. Pyka's deposition.

---

[59] Pyka Dep. 79:14-81:4. At his deposition, Mr. Pyka was seemingly unaware that Mr. Jomarron purportedly notarized the affidavit, and that Mr. Pyka purportedly presented his driver's license for the notarization. Pyka Dep. 80:23-81:1, 83:13-83:19.
[60] Pyka Dep. 56:3-56:5.
[61] Ex. 4, Macrina Dep. Exhibit D, Exhibit E, Exhibit I..
[62] Fla. Stat. § 718.111(1)(b), (12).
[63] Ex. 4, Marcina Dep. 22:3-22:16.
[64] Ex. 4, Macrina Dep. 16:20-16:25.
[65] *Compare* Affidavit of Blake Pyka ¶¶ 8-9, 12-13 [ECF No. 34-4], Pyka Dep. Ex. N *with* Pyka Dep. 84:1-84:10.
[66] Ex. 5, Pyka Dep. 56:13-60:16.
[67] Pyka Dep. 61:23-62:1.
[68] Pyka Dep. 63:2-63:10.

LEGAL\52208557\1

39.     A closer inspection of Mr. Pyka's time log reveals that Mr. Pyka wrote the entries recently and likely copied Mr. Womack's invoice to populate the document. The metadata reflects that the document was created on April 5, 2019. Therefore, at a minimum, thirty-five entries could not have been contemporaneously entered, contrary to the representation in Mr. Pyka's affidavit. [69]

40.     There are several other contextual indications that Mr. Pyka's time entries were not kept contemporaneously. For instance, the second entry is dated "10/19/2021" instead of "10/19/2018." There is an entry for 2/15/2019 after an entry for 3/7/2019. Likewise, there is a 12/19/2019 entry mixed in with the 2018 entries. Mr. Pyka also entered time for reviewing and executing the award on "Mar-2." But, he did not execute the award until March 11, 2020. March 2, 2020 is the date Mr. Womack billed for making the appraisal awards. Perhaps the most significant deficiency in Mr. Pyka's time log is that he did not record any time for drafting his $40+ million estimate for repairs to the exteriors and interiors of twelve buildings. [70]

41.     Mr. Pyka's sworn affidavit states that he "recorded time on a contemporaneous basis and kept records of [his] expenses." However, Mr. Pyka's spreadsheet contains no expenses, and Mr. Pyka testified at deposition that he had no expenses. But, Mr. Pyka did incur expenses. He incurred mileage expenses, and overnight shipped a USB drive to Mr. Womack and to Mr. Lewis.

42.     While the contextual inconsistencies with Mr. Pyka's timekeeping are significant, the underlying data reveals additional issues. In the middle of the spreadsheet, the format of the entries changes from "MM/DD/YY" to "DD-Mth." When a "DD-Mth" entry is selected, the formula bar shows the full date including the year. Every "DD-Mth" entry contains a 2021 date. The default rule for Microsoft Excel is that when a date is entered with only a month and day, the current year is assumed. [71] Therefore, many entries for 2019/2020 events were likely entered in 2021.

---

[69] Ex. 7, Wolfinger Forensics Expert Report, at 3, 7-8, 11-12, 16.
[70] Ex. 7, Wolfinger Forensics Expert Report, at 3, 9-13, 16.
[71] Ex. 7, Wolfinger Forensics Expert Report, at 3, 5-6, 9, App. F.

I.      <u>Applicable Law for Vacating Appraisal Awards</u>

Florida state and federal courts "recognize that there are some differences between appraisal and arbitration provisions," but "generally construe appraisal clauses as narrow arbitration provisions." *Pelican Pointe of Sebastian II Condo. Ass'n, Inc. v. Empire Indem. Ins. Co.*, No. 05-14142-civ, 2007 WL 9702449, at *2 (S.D. Fla. Aug. 8, 2007) (collecting cases). "However, one key difference between appraisal awards and arbitration decisions is that an arbitration decision will determine the entire dispute, whereas appraisals determine only the amount of loss." *Id.* Nonetheless, courts look to the applicable arbitration code to determine whether to vacate an appraisal award. *A.L. Gary & Assocs., Inc. v. Travelers Indem. Co. of Conn.*, No. 08-60636-civ, 2008 WL 11333729, at *6 (S.D. Fla. Aug. 27, 2008).

"When an arbitration agreement involves interstate commerce, the Federal Arbitration Act ("FAA") governs, supplemented by the Florida Arbitration Code ("FAC") to the extent that the FAC does not conflict with the FAA." *UBS Fin. Servs. Inc. v. Walzer*, No. 9:19-cv-81161, 2019 WL 7283220, at *2 (S.D. Fla. Dec. 27, 2019) (citing 9 U.S.C. §§ 1-2)); *see also Kong v. Allied Prof'l Ins. Co.*, 750 F.3d 1295, 1303 (11th Cir. 2014) (explaining that the FAA applies to all contracts involving interstate commerce).[72] The analysis for vacating an appraisal award is the same under the FAA and FAC. *Morgan Keegan & Co. v. Lieberman*, No. 11-20884-civ, 2011 WL 13223481, at *2 (S.D. Fla. Dec. 19, 2011) (Report and Recommendation). However, under the FAC, which supplements the FAA, vacatur is mandatory, not permissive. Fla. Stat. § 682.13(1) (stating that "the court shall vacate an arbitration award," not "may vacate"). The Policy involves interstate commerce, and therefore the FAA governs. Notice of Removal, at 2-3 [ECF No. 1].

II.     <u>The Appraisal Awards should be vacated because Mr. Pyka had an actual bias, or alternatively, failed to disclose a potential bias.</u>

Section 10(a)(2) of the FAA provides for vacatur of an arbitration award "where there was evident partiality or corruption in the arbitrators, or either of them." 9 U.S.C. § 10(a)(2);

---

[72] *Belz v. Morgan Stanley Smith Barney, LLC*, No. 3:13-cv-636, 2014 WL 897048, *5 (M.D. Fla. Mar. 5, 2014) (stating that "the law is settled that in a case ... involving interstate commerce, the FAC applies only to the extent that it is not in conflict with the FAA"); *Commercial Interiors Corp. of Boca Raton v. Pinkerton & Laws, Inc.*, 19 So. 3d 1062, 1064 n.2 (Fla. Dist. Ct. App. 2009) (noting that the grounds to vacate an arbitration award under the FAA and the FAC "are essentially the same"); 9 U.S.C. § 10; Fla. Stat. § 682.13.

*accord* Fla. Stat. § 682.13(1)(b). To satisfy the "evident partiality" standard, a party challenging an arbitration award need not show actual bias on the part of an arbitrator. *See Commonwealth Coatings Corp. v. Continental Cas. Co.*, 393 U.S. 145, 150 (1968) (holding that arbitrators "not only must be unbiased but also must avoid even the appearance of bias"). Accordingly, an arbitration award may be vacated due to the evident partiality of an arbitrator "when either (1) an actual conflict exists, or (2) the arbitrator knows of, but fails to disclose, information which would lead a reasonable person to believe that a potential conflict exists." *Univ. Commons-Urbana, Ltd. v. Universal Constructors Inc.*, 304 F.3d 1331, 1339 (11th Cir. 2002) (quoting *Gianelli Money Purchase Plan & Tr. v. ADM Investor Servs., Inc.*, 146 F.3d 1309, 1312 (11th Cir. 1998)).

Whether an appraiser disclosed a bias should be governed by a "reasonable person standard." *Id.* at 1341. Arbitrators are required to disclose "facts that create a reasonable impression of partiality." *Lifecare Int'l, Inc. v. CD Med., Inc.*, 68 F.3d 429, 433 (11th Cir. 1995) (quotation marks omitted). The arbitrator must make the disclosure at the commencement of the arbitration. *See Univ. Commons-Urbana*, 304 F.3d at 1344 ("Also relevant is whether Mayerson delayed disclosing the meeting until it was unreasonable for Universal and Reliance to object to his participation in the arbitration.").

In addition to the requirements of the FAA, the FAC requires appraisers to disclose having a "financial … interest in the outcome" before accepting an appointment, and an appraiser that fails to disclose his financial interest "is presumed to act with evident partiality under s. 682.13(1)(b)." Fla. Stat. § 682.041(1), (5). To disqualify an appraiser, "it need not be shown that bias influenced his judgment, but only that there was a circumstance tending to bias that judgment." *Gaines Constr. Co. v. Carol City Utils., Inc.*, 164 So. 2d 270, 272 (Fla. Dist. Ct. App. 1963) (emphasis removed); *see also Austin S. I, Ltd. v. Barton-Marlow Co.*, 799 F. Supp. 1135, 1142 (M.D. Fla. 1992) (explaining that an arbitration award may be vacated where "the arbitrator had a personal interest in the proceedings, whether pecuniary or otherwise, which would have biased his or her judgment in the proceedings").

While Biscayne Beach denies that Mr. Pyka was ever entitled to a contingent fee, Mr. Pyka drafted two contingent fee agreements, advised the panel he was entitled to a percentage of the award, and has not invoiced Biscayne Beach or been paid. Failing to disclose the contingent fee agreement at the outset of the appraisal raises a presumption that Mr. Pyka

12

acted with evident partiality. Fla. Stat. § 682.041(1), (5). At a minimum, Mr. Pyka admits that he believed he had a contingent fee, and repeatedly offered to work on a contingent fee basis.

Mr. Pyka was required to disclose his "offers" to work on a contingent fee at the latest in August 2019, when he drafted and sent to Biscayne Beach two contingent fee agreements, which Biscayne Beach's agent Mr. Martinez approved. Delaying his disclosure until the day that the appraisal panel was to conduct its final negotiation is "insufficient to avoid vacatur." *See Univ. Commons-Urbana*, 304 F.3d at 1344. This late disclosure was also incomplete because Mr. Pyka refused to answer follow-up questions about his fee. Mr. Pyka even admits that he will not seek payment until this lawsuit is resolved, which means that even if Mr. Pyka is to be paid hourly, his compensation is nonetheless tied to the outcome of the appraisal.

There are also indications that Mr. Pyka was influenced by Biscayne Beach's public adjuster. Mr. Pyka inexplicably wrote an estimate dated five months before the appraisal began. This date is the same date contained on Mr. Martinez' estimate, which suggests that Mr. Pyka prepared his estimates using a data file provided to him by Mr. Martinez. Given that Mr. Martinez was not impartial as a result of his contingent fee agreement and his having estimated the loss as Biscayne Beach's public adjuster, it was improper for Mr. Martinez to influence Mr. Pyka. *Verneus v. Axis Surplus Ins. Co.*, No. 16-21863-civ, 2018 WL 3417905, at *6 (S.D. Fla. July 13, 2018). For these reasons, the Appraisal Awards should be vacated.

### III.   Westchester was denied a fair appraisal because Mr. Pyka was not "competent and impartial."

Section 10(a)(3) provides for vacatur where misbehavior by an arbitrator prejudices the rights of any party. 9 U.S.C. § 10(a)(3); *accord* Fla. Stat. § 682.13(1)(b). The Court should vacate an award if the arbitrator's conduct "prejudice[d] the rights of the parties and denie[d] them a fair hearing." *CM S. E. Tex. Houston, LLC v. Care Minders Home Care, Inc.*, 662 F. App'x 701, 704 (11th Cir. 2016). In determining whether "an arbitrator's misbehavior or misconduct prejudiced the rights of the parties, we ask whether the parties received a fundamentally fair hearing." *Move, Inc. v. Citigroup Global Mkts., Inc.*, 840 F.3d 1152, 1158 (9th Cir. 2016). "A fundamentally fair hearing is one that 'meets the minimal requirements of fairness' – adequate notice, a hearing on the evidence, and an impartial decision by the arbitrator." *Battles v. Am. Van Lines, Inc.*, Case No. 15-cv-62247, 2016 WL 1258597, at *5 (S.D. Fla. Mar. 31, 2016) (quoting *Generica Ltd. v. Pharm. Basics, Inc.*, 125 F.3d 1123, 1130 (7th Cir. 1997)).

*Move* is instructive. The Ninth Circuit remanded with instructions to vacate an arbitration award under § 10(a)(3) because "an arbitrator's purposeful and material deception resulted in his selection as chairperson of a panel." *Move, Inc.*, 840 F.3d at 1158. Move, Inc. believed it was necessary for the chairperson of a panel to have experience in securities litigation, and struck candidates who were not experienced attorneys. *Id.* at 1158-59. Move agreed to a Mr. Frank, relying on his falsified credentials. *Id.* at 1159. Citigroup argued that there was "no evidence that Mr. Frank influenced other members of the panel or that the outcome of the arbitration was affected by his participation." *Id.* The Ninth Circuit rejected this argument because "there is simply no way to determine whether that was the case. In any event, Mr. Frank's **participation was itself prejudicial to Move**." *Id.* (emphasis added). The court explained that because the parties "agreed to arbitrate their multi-million dollar dispute before a panel of three qualified arbitrators as provided by FINRA's rules and regulations, the parties' rights to such a proceeding were prejudiced by the inclusion of an arbitrator … who should have been disqualified from arbitrating the dispute in the first place." *Id.*

The Policy set requirements for the appraisers—that they be "competent and impartial"—which this Court has recognized. *Shores at Coco Plum Condo. Ass'n, Inc. v. Westchester Surplus Lines Ins. Co.*, No. 18-23910-civ, 2019 WL 2223172, at *2 (S.D. Fla. Apr. 29, 2019) (Cooke, J.) ("It is well-settled that an appraiser with a financial interest in the outcome of an appraisal is not impartial."). The contractual requirement for "impartial" appraisers "excludes those with a pecuniary interest in the outcome." *State Farm Fla. Ins. Co. v. Crispin*, 290 So. 3d 150, 153 (Fla. 5th DCA 2020).[73]

Courts set aside appraisal awards where an appraiser was under a contingent fee, because where the policy requires the parties to "select a competent and impartial appraiser," the appraisal award "was the product of an improper appraisal process." *Shree Hari Hotels, LLC v. Society Ins.*, No. 1:11-cv-01324, 2013 WL 4777212, at *1-3 (S.D. Ind. Sept. 5, 2013). The awards must be vacated because "the plain language of the contract requires that both sides select an 'impartial' appraiser," and when one appraiser is on a contingent fee, the

---

[73] *Crispin* used the term "disinterested" instead of "impartial," but defined "disinterested" to mean "impartial." 290 So. 3d at 153. *See also State Farm Fla. Ins. Co. v. Valenti*, 285 So. 3d 958, 960 (Fla. 4th DCA 2019); *Verneus*, 2018 WL 3417905, at *6; *Landmark Am. Ins. Co. v. H. Anton Richardt, DDS, PA*, No. 2:18-cv-600, 2019 WL 2462865, at *3 (M.D. Fla. June 13, 2019).

14

appraisal "is not conducted in accordance with the policy." *Colorado Hospitality Servs., Inc. v. Owners Ins. Co.*, No. 14-cv-001859, 2015 WL 4245821, at *3 (D. Colo. July 14, 2015).

Mr. Pyka had a financial interest in the appraisal, or alternatively, believed he did and repeatedly offered to work on a contingent fee basis. He also appears to have taken direction from Mr. Martinez. This arrangement, however, is not what Westchester bargained for. The appraisal provision of the policy required Biscayne Beach to select a "competent and impartial" appraiser. Under well-established law, Mr. Pyka was not impartial. His very participation in the appraisal was prejudicial to Westchester. *Move, Inc.*, 840 F.3d at 1159.

Mr. Pyka's conduct as appraiser bears out this conclusion. Mr. Pyka estimated Biscayne Beach's loss at triple what it would cost to rebuild the entire property. Westchester was also denied a fair appraisal because the panel wrote the Appraisal Awards in a manner to maximize the amount of money Biscayne Beach can obtain from Westchester, and considered legal issues in the process.[74] Therefore, the Appraisal Awards should be vacated.

### IV.   Mr. Pyka was without power to act as an appraiser because he was not "competent and impartial."

Section 10(a)(4) provides for vacatur where "the arbitrators exceeded their powers …." 9 U.S.C. § 10(a)(4); *accord* Fla. Stat. § 682.13(1)(d). The arbitrators' power is derived from the contract. *AT&T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 648-49 (1986). Where an arbitrator has not been appointed "in conformance with the procedure specified in the parties' agreement to arbitrate," the arbitrator exceeds his powers by conducting the arbitration. *See R.J. O'Brien & Assocs., Inc. v. Pipkin*, 64 F.3d 257, 263 (7th Cir. 1995).[75] "[A]n award will not be enforced if the arbitrator is not chosen in accordance with the method agreed to by the parties." *Avis Rent a Car Sys., Inc. v. Garage Emps. Local Union 272*, 791 F.2d 22, 25 (2d Cir. 1986). An award entered by a panel that does not meet the requirements of the arbitration provision must be vacated. *See Szuts v. Dean Witter Reynolds, Inc.*, 931 F.2d 830, 831 (11th Cir. 1991); *Cat Charter, LLC v. Schurtenberger*, 646 F.3d 836, 843 (11th Cir. 2011).

To invoke the Policy's appraisal process, a party must first: "make written demand for an appraisal of the loss. In this event, each party will select a competent and impartial appraiser." Once the panel was selected, albeit improperly, the panel further stipulated in the

---

[74] Ex. 6, Womack Dep. 60:5-61:6.
[75] A "trivial departure," however, would not mandate vacatur. *Pipkin*, 64 F.3d at 263.

Declarations of Appraiser that each member of the panel "shall act with strict impartiality."[76] As discussed above, Mr. Pyka was not an "impartial" appraiser within the meaning of the Policy. An appraiser who repeatedly attempts to obtain a financial interest in the award cannot be said to act with "strict impartiality." Because Mr. Pyka satisfied neither the impartiality requirement of the Policy nor the stipulated requirement for the panel to act with strict impartiality, he was without power to act as an appraiser, including when he appointed Mr. Womack as umpire.

### V.   The appraisal panel exceeded its powers or so imperfectly executed its powers that a mutual, final, and definite award was not made.

Section 10(a)(4) of the FAA provides for vacatur where the panel "so imperfectly executed [their powers] that a mutual, final, and definite award upon the subject matter was not made." 9 U.S.C. § 10(a)(4). The Eleventh Circuit recognizes that an award may be vacated under Section 10(a)(4) where the arbitrators fail to provide a level of detail agreed to by the parties. *Cat Charter, LLC*, 646 F.3d at 843-44. In *Cat Charter*, after the commencement of an arbitration, the parties agreed that arbitrators would provide a "reasoned award." *Id.* at 840. The Eleventh Circuit explained that arbitrators may "exceed [their] authority by failing to provide an award in the form required by an arbitration agreement." *Id.* at 843.

The Declarations of Appraiser signed by each member of the panel states that the panel agreed to "make a true, just and conscientious award of the same." Mr. Womack further "agree[d] to supply an estimate that coincides with the award." "Conscientious" is defined as "meticulous[,] careful[,] scrupulous." *State v. Taylor*, 269 P.3d 740 (Haw. 2011) (Acoba, J., concurring & dissenting) (quoting Merriam Webster's Collegiate Dictionary 245 (10th ed. 1993)). Accordingly, the panel agreed to make a "meticulous, careful, and scrupulous" appraisal award.

Even if the panel did not agree to issue a "meticulous, careful, and scrupulous" award, an award should be vacated when "the arbitrator either failed to resolve an issue presented to him or issued an award that was so unclear and ambiguous that the reviewing court could not engage in meaningful review." *Int'l Longshoremen's Ass'n, Local No. 1624 v. Hampton Roads Shipping Ass'n*, 46 F.3d 1124, 1995 WL 19321, at *6 (4th Cir. 1995) (citing *Bell Aerospace Co.*

---

[76] Ex. 8, Appraisal Award, at 13, 28.

*Div. of Textron v. Local 516*, 500 F.2d 921, 923 (2d Cir. 1974)).[77] The Eleventh Circuit agrees that "an arbitrator can, in fact, exceed his powers by not doing enough." *Cat Charter*, 646 F.3d at 843 n.14 (quotation marks omitted).

Here, it is necessary for the parties to have sufficient information about the composition of the Appraisal Awards so that the Court can determine coverage for the specific elements. Westchester seeks vacatur because the Appraisal Awards are so unclear and ambiguous that the coverage provisions of the Policy cannot be applied. The Policy covers only "direct physical loss of or damage to Covered Property." It does not cover costs for matching,[78] and coverage for increased costs associated with complying with building codes is limited to $250,000.[79]

The Appraisal Awards vaguely provide an amount of loss "per trade," but do not explain where the repairs are to be performed or why. This information is necessary to determine what amounts are covered under the Policy. The members of the appraisal panel were unable to provide more information about numerous parts of the award, and actually disagreed with each other about the composition of the Appraisal Awards. The Appraisal Awards contain an unquantifiable amount of matching costs,[80] and it is not clear whether the electrical costs are related to fencing,[81] which is not Covered Property under the Policy.[82] There are significant portions of the award that the panel cannot explain.[83] Given that the Policy is a condominium policy and Biscayne Beach only has a limited insurable interest with respect to unit interiors,[84] this is a significant problem.

---

[77] An award may also be vacated where it "simply reflect[s] [the appraisers'] own notions of [economic] justice." *Oxford Health Plans LLC v. Sutter*, 569 U.S. 564, 569 (2013).

[78] *Bahama Bay II Condo. Ass'n, Inc. v. United Nat'l Ins. Co.*, 374 F. Supp. 3d 1274, 1283 (M.D. Fla. 2019) (explaining that "matching" costs are not covered because they are not "physical loss").

[79] *Liberty Am. Ins. Co. v. Kennedy,* 890 So. 2d 539, 542 (Fla. 2d DCA 2005) ("Only if a court determines that coverage exists for [an] element of loss will the amount of appraisal for that element of loss be binding on [the insurer].").

[80] *Supra*, Para. 16.

[81] Womack Dep. 48:8-48:16.

[82] Exhibit 1, Policy, at 15.

[83] *Supra*, Para 19.

[84] Fla. Stat. § 718.111(11)(f)(3).

Accordingly, the panel failed to issue a "meticulous, careful, and scrupulous" award as stipulated. The Appraisal Awards are not "meticulous, careful, and scrupulous, and are otherwise so unclear and ambiguous that it is not possible to determine what amounts are (1) within the scope of coverage, (2) excluded, or (3) within the Ordinance or Law sub-limit.[85]

**VI.** **The Appraisal Awards were procured by fraud and undue means.**

Section 10(a)(1) of the FAA provides for vacatur where "the award was procured by corruption, fraud, or undue means." 9 U.S.C. § 10(a)(1); *accord* Fla. Stat. § 682.13(1)(a). "Undue means" includes "undisclosed relationships between an arbitrator and one of the contestants." *Sorren v. Kumble*, 578 So. 2d 836, 836 (Fla. Dist. Ct. App. 1991). "Fraud" is "[a] knowing misrepresentation or knowing concealment of a material fact made to induce another to act to his or her detriment." Black's Law Dictionary (11th ed. 2019).

To vacate an award based on fraud, (1) "the movant must establish the fraud by clear and convincing evidence"; (2) "the fraud must not have been discoverable upon the exercise of due diligence prior to or during the arbitration"; and (3) "the person seeking to vacate the award must demonstrate that the fraud materially related to an issue in the arbitration." *Bonar v. Dean Witter Reynolds, Inc.*, 835 F.2d 1378, 1383 (11th Cir. 1988). "This last element does not require the movant establish that the result of the proceedings would have been different had the fraud not occurred." *Id.*

Mr. Pyka produced what appears to be a fabricated document to support his and Biscayne Beach's contention that Biscayne Beach never agreed to pay Mr. Pyka on a contingent fee basis. Westchester accepts that this document was created after the Appraisal Awards were procured, but believes that this fabricated time log is evidence of a long-term plan between Biscayne Beach and Mr. Pyka to conceal their true fee agreement. Biscayne Beach's and Mr. Pyka's interests are fully aligned in this matter. Mr. Pyka swore under oath that the time sheet that he produced was contemporaneously kept, but the evidence demonstrates that it was a recent fabrication. This fabrication should be imputed to Biscayne Beach because Mr. Pyka and Biscayne Beach together were parties to an improper fee agreement and this was an attempt to conceal that improper agreement. Additionally, Mr.

---

[85] Counsel for Biscayne Beach has taken the position that Mr. Lewis violated the stipulated requirements of the Declarations of Appraiser by continuing with the appraisal despite learning of Mr. Pyka's contingent fee agreement. Lewis Dep. 67:8-70:25.

Pyka's use of Mr. Martinez's estimates following Mr. Martinez's disqualification as appraiser shows that Biscayne Beach and its agents have been attempting to circumvent the rules from the beginning.

Further, Biscayne Beach submitted an affidavit for Mr. Pyka that contained materially false statements. Counsel for Biscayne Beach assisted Mr. Pyka in making the following false statements (in an affidavit that Mr. Jomarron himself purportedly notarized):

> 7.     *I recorded my time on a contemporaneous basis and kept records of my expenses.*

But, at deposition, Mr. Pyka testified: "I don't believe I have any expenses on this claim."[86]

> 12.     *My mistaken belief that I had a contingent fee agreement did not manifest until my review of the file on February 3, 2020.*

But, Mr. Pyka drafted contingent fee agreements on August 5, 2019 and August 19, 2019, and testified as follows:

> Q:     What I'm showing you will be attached as Exhibit L.... [Y]ou forwarded an e-mail from Lester Martinez to plaintiff's counsel and copied to you on August 19, 2019, correct?
> A:     Yes, Sir.
>
> *       *       *
>
> Q:     Okay. And then you made that change to the fee agreement, which is here, and he forwarded the revised contract to Mr. Jesmany, is that right?
> A:     Yes, sir.
> Q:     The revised contract continued to state that your fee is 1 percent of the total loss, right?
> A:     That was an offer I provided, yes, sir.
> Q:     So on August 19, 2019, you thought you were being paid on a contingency fee basis, right?
> A:     Again, I didn't know how I was getting paid whatsoever. I just threw it out there.... It was just an offer that I sent to him.[87]

> 13.     *Accordingly, this mistaken belief had zero impact on my work or conclusions reached in the appraisal because the appraisal amounts had been determined and agreed upon by the panel prior to February 3, 2020, and did not change through entry of the award in March 2020.*

> 14.     *After February 3, 2020, I merely worked with the panel on the formatting of the award documents. The amounts of the awards did not change.*

---

[86] Pyka Dep. 57:9-57:11.
[87] Pyka Dep. 72:25-74:4.

But, Mr. Pyka testified that the panel did not negotiate the award or building valuations until after he made the disclosure:

> Q:      So it was on the phone – was it on the phone call on February 3rd, 2020 that the values for the award were agreed upon?
> A:      I believe so.
>                              * * *
> Q:      Okay. At some point after this e-mail, you agreed upon and approved those building valuations and then the award package was sent out, right?
> A:      Yes, sir.[88]

Through all of this, there is no paper trail reflecting the purported hourly fee agreement or showing how the Affidavit of Blake Pyka came to be.[89] Biscayne Beach used that affidavit to vigorously argue against permitting discovery in this action. Taking everything together, the evidence shows that Mr. Pyka has a contingent fee agreement.  If that is true, then Biscayne Beach has concealed Mr. Pyka's fee agreement in order to circumvent the requirements of the Policy and the applicable arbitration code.

Westchester could not have discovered the fraud being perpetrated by Biscayne Beach and Mr. Pyka prior to or during the appraisal. Biscayne Beach did not disclose the details of Mr. Pyka's fee agreement, and still has not given a credible explanation of the fee agreement. When Mr. Lewis asked Mr. Pyka for more information, Mr. Pyka provided no detail and asked to move on. Further, Mr. Womack demonstrated that he was not interested in discussing Mr. Pyka's fee agreement. Courts recognize that appraisals are different from arbitrations in many respects, one of them being that they are not quasi-judicial panels like arbitrations, but are instead administered by property and construction professionals without direct party involvement. It is not up to the panel to decide legal issues, such as fraud. *See State Farm Fire & Cas. Co. v. Licea*, 685 So. 2d 1285, 1288 (Fla. 1996).

Accordingly, while the appraisal was being conducted, Westchester had no effective means of obtaining more information or challenging Mr. Pyka's appointment until the court reopened the case and permitted discovery, which Biscayne Beach opposed. *Aviall, Inc. v.*

---

[88] Pyka Dep. 48:10-49:25.
[89] The lack of a response from counsel for Biscayne Beach is unusual. Most attorneys would have responded immediately and told Mr. Pyka to revise the agreement, if for no other reason than to protect their client by ensuring no one is mistakenly claiming an interest in their client's insurance claim.

*Ryder Sys., Inc.*, 110 F.3d 892, 895 (2d Cir. 1997) (explaining that the FAA "does not provide for pre-award removal of an arbitrator"). In furtherance of its attempt to conceal information, counsel for Biscayne Beach invited Mr. Pyka to his office to sign an affidavit that contained multiple false statements, and then submitted the affidavit to this Court. Biscayne Beach filed oppositions to Westchester's motion to reopen the case and motion to vacate, and in both vehemently denied Mr. Pyka had a contingent fee agreement. Biscayne Beach went so far as to argue that holding an evidentiary hearing would be futile [ECF No. 39, at 14-17].

When the Court permitted discovery, Mr. Pyka produced documents reflecting that he drafted two contingent fee agreements, and Biscayne Beach's agent Mr. Martinez directed counsel for Biscayne Beach to "get this signed for Blake." Biscayne Beach knew that Mr. Martinez was disqualified as appraiser for the very same reason, and therefore cannot justify failing to disclose that Mr. Pyka submitted a contingent fee agreement for signature.

Mr. Pyka's sworn statements are plainly inconsistent. Mr. Pyka's time log appears fabricated. Mr. Pyka and Biscayne Beach concealed information about Mr. Pyka's fee agreement. Counsel for Biscayne Beach screens Mr. Pyka's document productions and drafted the affidavit that contains verifiably false statements. Mr. Pyka's fabricated time log was merely the final act of a long, calculated scheme by Biscayne Beach to conceal the improper fee agreement, which would have made Mr. Pyka ineligible to serve as appraiser in the first instance, and is therefore materially related to the appraisal. Taken together, the available evidence demonstrates that the Appraisal Awards should be vacated.

WHEREFORE, Defendant, Westchester Surplus Lines Insurance Company, respectfully requests the Court enter an Order vacating the Appraisal Awards, and awarding any other relief the Court deems equitable, just, and proper.

Respectfully submitted,

**COZEN O'CONNOR**

By: /s/John David Dickenson
John David Dickenson
Florida Bar No. 575801
jdickenson@cozen.com
Chad A. Pasternack
Florida Bar No. 117885
cpasternack@cozen.com

One North Clematis Street, Suite 510
West Palm Beach, Florida  33401
Telephone:  (561) 515-5250

*Counsel for Defendant, Westchester Surplus
Lines Insurance Company*

LEGAL\52208557\1